UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
ANDREW BALINT,                                             :
                                                          :        **COMPLAINT**
                                 Plaintiff,                :
                 -against-                                 :        21 -cv- 6521
                                                          :
LEEWOOD GOLF CLUB, INC.                                    :        **Jury Trial Demanded**
                                                          :
                                 Defendants.               :
-------------------------------------------------------- X

Plaintiff, Andrew Balint, by his attorneys, the Law Offices of Russell E. Adler PLLC, for his Complaint against Defendant, Leewood Golf Club, Inc. ("LGC" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for disability discrimination and retaliation under the Americans with Disabilities Act and New York State Human Rights Law.  Plaintiff, the former Assistant General Manager of Defendant, Leewood Golf Club, has type 1 diabetes and asthma, both of which placed him at risk of severe illness or death if he contracted Covid-19.  LGC knew of Mr. Balint's condition, yet terminated him after he initially requested an accommodation.  After he retained counsel, LGC reinstated Mr. Balint.  One week after his reinstatement, LGC hosted an event that violated numerous Covid-19 protocols, including being significantly in excess of the number of permitted participants.  Mr. Balint worked the event and was shocked by the flagrant disregard for even the most basic Covid-19 safety guidelines (e.g., masks, social distancing, etc.) — guidelines intended to protect Plaintiff as well as LGC's employees, members and guests. When Mr. Balint objected to his supervisor and informed his supervisor that he could not remain on premises given the risks to his health and safety, he was immediately terminated.

2.      After an investigation, the EEOC concluded LGC: (a) did not follow applicable CDC and New York State Covid-19 guidelines; (b) failed to reasonably accommodate Plaintiff; and (c) engaged in unlawful retaliation.

**JURISDICTION & VENUE**

3.      This Court has jurisdiction over this action under 28 U.S.C. § 1331, 42 U.S.C. § 12101 et seq. (The Americans with Disabilities Act, "ADA") and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 (New York Executive Law § 290 et seq, the New York State Human Rights Law, "NYSHRL").

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) because all or a substantial part of the events giving rise to Plaintiff's claims occurred in the Southern District of New York and the parties all reside in the Southern District of New York.

**ADMINISTRATIVE EXHAUSTION**

5.      On or about July 6, 2020, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and retaliation under the ADA and NYSHRL, Charge No. 520-2020-04335 ("EEOC Charge").

6.      On or about July 13, 2020, Plaintiff filed an amended charge of discrimination ("Amended EEOC Charge") as a result of his termination after a brief period of reinstatement (see below).

7.      Plaintiff's case was initially assigned to the EEOC's mediation unit; however, the parties were unable to resolve the case in mediation.

8.      The EEOC then transferred the Amended EEOC Charge to its investigative unit.

9.      The EEOC's investigation included among other things: requesting documents from Plaintiff, interviewing Plaintiff, requesting LGC submit a statement of position in response to the Amended EEOC Charge, and providing LGC with the opportunity to provide documents, additional statements and/or futher evidence.

10.      On or about June 25, 2021, after concluding its investigation, the EEOC issued its Determination (See **Exhibit A**).

11.     The EEOC Determination stated, in relevant part (bold emphasis added):

Respondent states that they followed all CDC and New York State guidelines regarding the COVID-19 pandemic, **however the Commission's investigation revealed this to be false**. Almost no participants at Respondent were wearing a face mask or practicing social distancing on July 11, 2020. Furthermore, kitchen staff were not wearing face masks and there was no signage posted at Respondent encouraging or enforcing participants and staff to wear face masks. **Therefore, Respondent did not provide Charging Party with the reasonable accommodation that was agreed upon.** When charging Party was unable to perform his job without the accommodation, he participated in the protected activity of complaining to the general manager and was terminated almost immediately after without regard to his accommodation requests. **The Commission has determined Respondent did not provide Charging Party a reasonable accommodation and retaliated against Charging Party for reporting this discrimination in violation of the ADA.**

12.     As a result of the Determination, the EEOC initiated the conciliation process.

13.     Conciliation was unsuccessful.

14.     On or about July 28, 2021, the EEOC issued Plaintiff a Dismissal and Notice of Right to Sue based on the failure of the conciliation process.

15.     Plaintiff timely commenced this action within 90 days of receipt of the Dismissal and Notice of Right to Sue.

## PARTIES

16.     Mr. Balint is a 49-year-old male and a resident of Westchester County, New York.

17.     Mr. Balint has type 1 diabetes and asthma, both disabilities under the ADA and NYSHRL.

18.     Leewood Golf Club, Inc. is IRC § 501(c)(7) not for profit corporation located at 1 Leewood Drive, Eastchester, NY, 10709.

19.     LGC is a located on 99 acres and has facilities for golf and tennis, a swimming pool, dining room and related activities for its members.

20.     LGC's reported revenue for the year 2018, the last year for which its Form 990 is

available for public review, was in excess of $7 million dollars.

21.     LGC employs in excess of 20 employees.

### FACTS

22.     On or about June 24, 2019, Mr. Balint commenced employment with LGC as the Assistant General Manager.

23.     During his tenure at LGC, Mr. Balint was not the subject of any disciplinary or corrective action.

24.     Mr. Balint disclosed his diabetes and asthma to, among others, his supervisor, LGC's General Manager, Mauro Piccininni.

25.     As a result of the Covid-19 pandemic, LGC was partially closed from mid-March through early June 2020.

26.     During LGC's partial closure, Mr. Balint continued to work remotely and was able to perform all duties satisfactorily.

27.     On or about June 4, 2020, Mr. Balint was advised that LGC would re-open to its members as of June 10, 2020.

28.     Mr. Balint assisted Mr. Piccininni in implementing the safety guidelines recommended by New York State and the CDC, however, it was quickly apparent to Mr. Balint that LGC was lax on enforcement of the safety guidelines.

29.     For example, LGC did not implement temperature checks and LGC took no action with regard to members or staff who refused to wear masks or practice social distancing.

30.     In or about early June 2020, Mr. Balint spoke with Mr. Piccininni about his health concerns in relation to his ability to physically return to work during the pandemic.

31.     Mr. Balint explained to Mr. Piccininni that his health conditions placed him at

4

extreme risk if he contracted Covid-19 and asked that he be allowed to temporarily continue working remotely.

32.     Later that day, Mr. Piccininni stated that Mr. Balint would be placed on furlough, continue to receive medical benefits and return at a later date to full time employment.

33.     Mr. Piccininni also told Mr. Balint that he was being pressured by LGC's Board to require Mr. Balint to physically return to work.

34.     Mr. Balint told Mr. Piccininni that he would contact his doctor and provide supporting documentation for his request to be allowed to continue to work remotely.

35.     Before Mr. Balint submitted medical documentation in support of his request, Mr. Piccininni told Mr. Balint that his employment was terminated effective June 14, 2020.

36.     Following his termination, Mr. Balint learned that LGC sent two emails to its members regarding Mr. Balint, one of which improperly disclosed Mr. Balint's confidential medical information.

37.     The first email stated: "Please be advised that, due to COVID-19, Andrew Balint has been placed on furlough."

38.     The second email stated: "Our apologies, as the last notice regarding Andrew Balint was unclear.  Andrew is not infected.  He has worked off premise since the outbreak. However, Andrew has underlying health issues that make him vulnerable. As a result, Leewood has placed him on furlough."

39.     Mr. Balint did not authorize LGC to publicly disclose that he had "underlying health issues."

40.     Prior to terminating Mr. Balint's employment, LGC did not engage in any interactive process, dialogue or communication to determine a reasonable accommodation.

41.     Following his termination, Mr. Balint submitted a June 25, 2020 note from his

5

physician, Rachel Steinman, MD of Scarsdale Medical Group, that stated: "Please allow Mr. Balint to return to work in an isolated office. When needing to be exposed to others, please provide appropriate PPE and social distancing capabilities."

42.     As a result of his termination, Mr. Balint retained legal counsel.

43.     On or about June 25, 2020, Plaintiff, through counsel, requested that LGC, "reinstate Mr. Balint, either working remotely or on premises with the protections suggested by his physician…"

44.     On June 26, 2020, LGC's President, Steven Lazzaro, responded to Mr. Balint's counsel and stated that Mr. Balint's physical presence was required and that "Mr. Balint did not ask for any accommodations, but simply refused to report to work when requested to do so."

45.     Mr. Lazzaro further stated that, "the club has followed all CDC and New York State guidelines" and Mr. Balint could return to work the following day, June 27, 2020.

46.     On June 26, 2020, Mr. Balint's counsel responded:

[I]t is unclear from your letter what accommodations are being offered. Please provide clarification as to what specific duties will be expected, and what specific steps will be undertaken to safeguard Mr. Balint given his disabilities so we may continue the reasonable accommodation dialogue. Accordingly, Mr. Balint cannot return tomorrow, but remains willing to do so once we fully understand the nature and scope of the reasonable accommodation.

47.     Mr. Lazzaro responded on June 26, 2020, stating that Mr. Balint was refusing to return to work, but also that Mr. Balint would be provided with protective equipment and that social distancing would be enforced.   Mr. Lazzaro also provided a copy of Mr. Balint's job description.

48.     On June 29, 2020, Mr. Balint responded to Mr. Lazzaro clarifying that he was not refusing to return to work, rather, "I am working with you to find out exactly how the club can accommodate me and your letter leaves open many questions and I have concerns."   Mr. Balint

also provided a copy of then current New York State guidelines for employer and food service guidelines.

49.     Mr. Balint's June 29, 2020 letter also inquired about whether certain duties could be performed exclusively from his office and stated:

> With regard to performing any duties (especially indoors), will the club confirm that I may maintain a distance of not less than 6 feet away from all members and staff at all times?
>
> I am aware that a good number of members and guests are not adhering to social distancing guidelines and are not wearing masks, especially when indoors. Likewise, cleaning protocols are not being followed effectively. If the club does not enforce wearing masks, then I (and others) continue to remain at high risk. The club is also hosting events in excess of the approved number of attendees given the current phase 3 status provided, which demonstrates that the club is not adhering to published New York State guidelines despite what you say in your letter.

50.     On June 30, 2020, Mr. Lazzaro responded that "all of your duties at the Club can be done with social distancing of at least six feet…[and] all members and staff are required to adhere to CDC and New York State guidelines." Mr. Lazzaro then asked Mr. Balint to confirm by the end of the day whether he would be returning to work.

51.     On June 30, Mr. Balint responded, in relevant part, as follows:

> While I remain concerned about several issues raised in our correspondence (for example, lax enforcement of required wearing of masks and social distancing guidelines for members, hosting of events that exceed capacity under the current phased opening guidelines, etc.), I will nonetheless return to work given your assurances that I will be provided the appropriate PPE, allowed to work from my office when feasible and social distancing guidelines will be respected with regards to the performance of my duties.

52.      Mr. Balint returned to work on or about July 3, 2020.

53.     On July 7, 2020, Mr. Balint emailed Mr. Piccininni and club Vice President, George Brenlla to "report what I witnessed over the weekend and during my first few days back."

54.     Mr. Balint's July 7, 2020 email noted, among other things: (a) the failure to monitor

and/or exclude members or guests who travelled from areas subject to quarantine (e.g., Florida) (b) the absence of steps to screen out members or guests who recently attended another golf club in the area that had experienced positive coronavirus test results (c) the lack of signage regarding social distancing and handwashing protocols (d) the failure to follow daily health screening protocols for staff and (e) the lack of enforcement of mask wearing.

55.     Mr. Balint's July 7, 2020 email also inquired about the upcoming member-guest event which was scheduled for over 100 attendees despite the then in place restriction of 50 guests for non-essential gatherings.

56.     Mr. Brenlla responded to Mr. Balint: "Please make the necessary corrections."

57.     On July 7, 2020, Westchester County (part of New York's Mid-Hudson region) entered "phase four" of the state's reopening plan.[1]

58.     New York State's then applicable "Food Service Guidelines for Employers and Employees" ("Guidelines") is annexed as **Exhibit B**.

59.     The Guidelines provide, among other things, that "patrons must wear face coverings at all times, except when seated," and establishments must "ensure all staff wear face coverings at all times," and "implement daily health screening practices."

60.     Executive Order 202.45 was also applicable on July 11, 2020 (See **Exhibit C**).

61.     Executive Order 202.45 limited the number of individuals who could attend a non-essential social gatherings to 50 people, stating: "[Prior Executive Orders] that limited all non-essential gatherings, is hereby further modified to allow gatherings of fifty (50) or fewer individuals for any lawful purpose or reason, so long as any such gatherings occurring indoors do not exceed 50% of the maximum occupancy for a particular indoor area, and provided that the

---

1.     See: https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-city-enters-phase-iii-reopening-without-indoor-dining-and

location of the gathering is in a region that has reached Phase 4 of the State's reopening, and provided further that social distancing, face covering, and cleaning and disinfection protocols required by the Department of Health are adhered to."

62.    On July 11, 2020, LGC hosted a member-guest golf outing with more than 100 individuals in attendance, excluding employees.

63.    The member-guest event was a non-essential social gathering.

64.    Mr. Balint reported for work at approximately 7:00 am on July 11, 2020 to work the member-guest golf outing.

65.    During the outing, Mr. Balint observed rampant disregard for, among other things, face masks and social distancing among club board members (including the club President), staff, members and guests.

66.    Mr. Balint also observed that member and guest disregard of the mask mandate and social distancing requirements further declined as members and guests consumed excessive amounts of alcohol.

67.    Mr. Balint found himself repeatedly in close proximity to individuals who refused to wear masks or practice social distancing.

68.    At approximately 9:00 pm, after working 14 hours on the event, Mr. Balint told Mr. Piccininni that as a result of the environment, he had to leave the premises to protect his health and safety.

69.    At 9:24 pm (approximately 20 minutes after Mr. Balint's departure), Mr. Piccininni emailed Mr. Balint and terminated his employment.

## FIRST CLAIM

### Discrimination – Americans with Disabilities Act

70.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

71.    At all times relevant to this action, Plaintiff was employed by Defendant within the meaning of the ADA.

72.    At all times relevant to this action, Defendant was a covered entity within the meaning of the ADA.

73.    Plaintiff suffers from disabilities within the meaning of the ADA: type 1 diabetes and asthma.

74.    Plaintiff requested reasonable accommodations.

75.    Defendant discriminated against Plaintiff on the basis of his disability and/or perceived disability by failing to engage in the interactive process, denying Plaintiff reasonable accommodations, disclosing Plaintiff's confidential medical information and terminating his employment.

76.    Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

77.    As a result of Defendant's ADA violations, Plaintiff suffered and continues to suffer damages including, but not limited to, loss or denial of wages, salary, employment benefits and/or other economic harm and emotional distress.

## SECOND CLAIM

### Retaliation – Americans with Disabilities Act

78.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

79.    Plaintiff participated in protected activities under the ADA by requesting

reasonable accommodations and/or objecting to Defendant's failure to provide reasonable accommodations.

80.    Defendant retaliated against Plaintiff on the basis of his disability and/or perceived disability for exercising his rights under the ADA.

81.    Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

82.    As a result of Defendant's ADA violations, Plaintiff suffered and continues to suffer damages including, but not limited to, loss or denial of wages, salary, employment benefits and/or other economic harm and emotional distress.

**THIRD CLAIM**

**Discrimination — New York State Human Rights Law**

83.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

84.    At all times relevant to this action, Plaintiff was an employee of Defendant within the meaning of the NYSHRL.

85.    At all times relevant to this action, Defendant was an employer within the meaning of the NYSHRL.

86.    Plaintiff has type 1 diabetes and asthma, both disabilities within the meaning of the NYSHRL.

87.    Defendant discriminated against Plaintiff on the basis of his disability and/or perceived disability by failing to engage in the interactive process, denying Plaintiff reasonable accommodations, disclosing Plaintiff's confidential medical information and terminating his employment.

88.    As a result of Defendant's violations of the NYSHRL, Plaintiff suffered and continues to suffer damages including, but not limited to, loss or denial of wages, salary, employment privileges and/or other compensation and emotional distress damages.

89.     Defendant's violations constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CLAIM
### Retaliation — New York State Human Rights Law

90.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

91.     At all times relevant to this action, Plaintiff was an employee of Defendant within the meaning of the NYSHRL.

92.     At all times relevant to this action, Defendant was an employer within the meaning of the NYSHRL.

93.     Plaintiff participated in protected activities under the NYSHRL by requesting reasonable accommodations and/or objecting to Defendant's failure to provide reasonable accommodations.

94.     Defendant retaliated against Plaintiff on the basis of his disability and/or perceived disability for exercising his rights under the NYSHRL.

95.     As a result of Defendant's violations of the NYSHRL, Plaintiff suffered and continues to suffer damages including, but not limited to, loss or denial of wages, salary, employment privileges and/or other compensation and emotional distress.

96.     Defendant's violations constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## **RELIEF REQUESTED**

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment awarding Plaintiff:

a)    back pay, front pay, the value of lost benefits; compensatory damages and punitive damages in amounts to be determined at trial,

b)    Plaintiff's attorneys' fees, costs, and other disbursements;

c)    Pre-judgment and post-judgment interest; and

d)    Such other and further relief as the Court deems just and proper.

Dated:  August 2, 2021

LAW OFFICES OF RUSSELL E. ADLER PLLC

By:_____

  Russell E. Adler
450 Lexington Avenue, 4th Floor
New York, New York 10017
646.504.3299
russ@radlerlawpllc.com

# Exhibit A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY  10004-2112
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
New York Direct Dial:  (929) 506-5270
FAX (212) 336-3625
Website: www.eeoc.gov

**Charging Party**                          **Charge No:** 520-2020-04335
Andrew Balint
217 Tallwood Dr.
Hartsdale, NY 10530

**Charging Party Attorney**
Russell E. Adler, Esq.
The Law Offices of Russell E. Adler PLLC
78 Ridge Rd.
Katonah, NY 10536

**Respondent**
Leewood Golf Club, Inc.
1 Leewood Drive
Eastchester, NY 10709

**Respondent Attorney**
Jeffrey A. Shooman, Esq.
FordHarrison LLP
366 Madison Ave, 7ᵗʰ Floor
New York, NY 10017

## <u>DETERMINATION</u>

On behalf of the U.S. Equal Employment Opportunity Commission ("Commission"), I issue the following determination on the merits of the subject charge filed under the Americans with Disabilities Act, as amended ("The ADA"), Respondent is an employer within the meaning of the ADA. All requirements for coverage have been met.

Charging Party alleged disability discrimination and retaliation for reporting this discrimination. Charging Party worked as an Assistant Manager and has a disability making him more vulnerable to COVID-19. Charging Party alleges that Respondent was not enforcing CDC guidelines when reopening in June 2020. Charging Party submitted a doctor's note to continue to work remotely. This request was denied, and Charging Party was terminated effective June 14, 2020. Following his termination, Charging Party submitted a note stating he can work in person with the accommodations of an isolated office and an adherence to CDC guidelines regarding the COVID-19 pandemic. On July 11, 2020, Charging Party had to work an event where 108 people participated (a violation of Phase 4 guidelines limiting events to 50 people). Charging Party informed the General Manager that he had to leave to ensure his health and safety. Twenty minutes

later, Charging Party was terminated.

Respondent states that one of Charging Party's primary duties was to assure that the Club was adhering to the CDC social distancing guidelines and his job could not be done remotely anymore given the reopening of the club. Charging Party's original request for accommodation, not coming into work at all, was not reasonable. Respondent states that they followed all CDC and New York State guidelines and enforced social distancing and mask wearing in the dining area, among other measures. Respondent states that Charging Party publicly embarrassed the Club on July 11, 2020 when he informed Mr. Piccininni that he had "enough of this shit show" and left the Club. Respondent sent a termination email to him that night for abdicating his job and insubordination.

Respondent states that they followed all CDC and New York State guidelines regarding the COVID-19 pandemic, however the Commission's investigation revealed this to be false. Almost no participants at Respondent were wearing a face mask or practicing social distancing on July 11, 2020. Furthermore, kitchen staff were not wearing face masks and there was no signage posted at Respondent encouraging or enforcing participants and staff to wear face masks. Therefore, Respondent did not provide Charging Party with the reasonable accommodation that was agreed upon. When Charging Party was unable to perform his job without this accommodation, he participated in the protected activity of complaining to the general manager and was terminated almost immediately after without regard to his accommodation requests. The Commission has determined Respondent did not provide Charging Party a reasonable accommodation and retaliated against Charging Party for reporting this discrimination, in violation of the ADA.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation (i.e., settlement). Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. If you wish to participate in conciliation, please email Investigator Vani Rajkumar at vani.rajkumar@eeoc.gov, within 10 days from the date of this Letter of Determination.

When the Respondent declines to enter into conciliation discussions, or when the Commission's representative for any reason is unable to secure a settlement acceptable to the Commission, the Commission shall so inform the parties in writing and advise them of the court enforcement alternative available to the Charging Party, aggrieved persons and the Commission. The confidentiality provisions of the statute and Commission Regulations apply to information discussed or given during conciliation.

On behalf of the Commission:

VANESS [Digitally signed by VANESSA GUEST
A GUEST Date: 2021.05.25 FOR 07:06:19 -04'00'
Judy Keenan, Director
New York District Office

Date      5/25/21

# Exhibit B





# Reopening New York

**NEW YORK STATE**

**Food Services Guidelines for Employers and Employees**

These guidelines apply to all restaurants and food services establishments, including food trucks and other food concessions. In regions that are in Phase 1, or have not yet reached Phase 2, such establishments may only operate by take-out and delivery. In regions that have reached Phase 2, such establishments may open outdoor spaces with seating for customers, in accordance with "Interim COVID-19 Guidance for Outdoor and Take-Out/Delivery Food Services." In regions that have reached or surpassed Phase 3, such establishments may open indoor spaces with seating for customers, in accordance with the guidelines below/in "Interim COVID-19 Guidance for Food Services." Please see the aforementioned guidance for the definition of "outdoor space."

During the COVID-19 public health emergency, all operators of food service sites should stay up to date with any changes to state and federal requirements related to such establishments and incorporate those changes into their operations. This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.

| | Mandatory | Recommended Best Practices |
|---|---|---|
| **Physical Distancing** | ✓ Pursuant to the Cluster Action Initiative, effective November 11, 2020, in any yellow zone in Erie, Monroe, or Onondaga Counties, in addition to any other mitigation measures required, any restaurant or tavern must close by 12 midnight (12:00 am local time), and all service must cease at such time. The establishment cannot reopen or resume service until 5:00 am. Executive Order 202.68 also sets forth additional restrictions that food services establishments must adhere to in order to operate.<br><br>✓ Limit indoor capacity to no more than 75% of maximum occupancy, exclusive of employees.<br><br>✓ Limit outdoor capacity to the number of tables that can be safely and appropriately arranged, such that each table is a minimum of 6 ft. away from another.<br><br>✓ All indoor and outdoor tables with seating for customers must be separated by a minimum of 6 ft. in all directions. Wherever distancing is not feasible between tables, physical barriers must be enacted between such tables. Barriers must be at least 5 ft. in height and not block emergency and/or fire exits.<br><br>✓ Regardless of physical distance, employees must wear an acceptable face covering at all times.<br><br>✓ Patrons must wear face coverings at all times, except while seated; provided that the patron is over the age of 2 and able to medically tolerate such covering.<br><br>✓ Individuals seated at the same table must be members of the same party (but may be from different households), with a maximum of 10 people per table.<br>• If located in a cluster action zone pursuant to Executive Order 202.68, tables are limited to 4 individuals per party.<br><br>✓ Seating in bar areas and communal tables are only permitted if at least 6 ft. can be maintained between parties. | ✓ Ensure a distance of at least 6 ft. is maintained among workers at all times, unless the core activity requires a shorter distance. (e.g. cooking, cleaning, clearing tables).<br><br>✓ Prohibit the use of small spaces (e.g. freezers, storage rooms) by more than one individual at time.<br><br>✓ Modify the use and/or restrict the number of work stations/employee seating areas to maintain 6 ft. distance in all directions.<br><br>✓ Designate discrete work zones for services, where possible. Servers should serve specific zones in the restaurant to minimize overlap.<br><br>✓ Ensure kitchen staff are dedicated to one station throughout their entire shift. (e.g. salad or grill or desserts), to the extent possible.<br><br>✓ Encourage kitchen staff to place items on the counter for the next person to pick up, rather than passing items from hands to hands.<br><br>✓ Reduce bi-directional foot traffic by using tape or signs with arrows in narrow aisles, hallways, or spaces.<br><br>✓ Encourage customers to wait in their car or outside until food is ready to be picked up/they're ready to be seated.<br><br>✓ Encourage customers to place orders online or by phone.<br><br>✓ Allow for contactless order, payment, delivery, and pick-up, where possible.<br><br>✓ Allow customers that will be seated to order food prior to arrival, and encourage customer reservations for seating.<br><br>✓ Ensure a one-at-a-time process for vendors, in which one vendor delivers a product at a time, employees clean and disinfect high touch surfaces, and the next vendor can comes on the premises. |

**WEAR A MASK.   GET TESTED.   SAVE LIVES.**



# Reopening New York



**NEW YORK STATE**

## Food Services Guidelines for Employers and Employees

These guidelines apply to all restaurants and food services establishments, including food trucks and other food concessions. In regions that are in Phase 1, or have not yet reached Phase 2, such establishments may only operate by take-out and delivery. In regions that have reached Phase 2, such establishments may open outdoor spaces with seating for customers, in accordance with "Interim COVID-19 Guidance for Outdoor and Take-Out/Delivery Food Services." In regions that have reached or surpassed Phase 3, such establishments may open indoor spaces with seating for customers, in accordance with the guidelines below/in "Interim COVID-19 Guidance for Food Services." Please see the aforementioned guidance for the definition of "outdoor space."

During the COVID-19 public health emergency, all operators of food service sites should stay up to date with any changes to state and federal requirements related to such establishments and incorporate those changes into their operations. This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.

| | Mandatory | Recommended Best Practices |
|---|---|---|
| **Physical Distancing (Cont'd)** | ✔ Clearly signal 6 ft. spacing in any lines for customers waiting to order, pick-up food, be seated, or use the restroom, as well as in any pick-up or payment location. | |
| | ✔ Designate entrances/exits for customers and separate entrances/exits for employees, where possible. | |
| | ✔ Limit in-person employee gatherings (e.g. staff meetings) to the greatest extent possible. | |
| | ✔ Establish designated areas for vendor pickups and/or deliveries, limiting contact to the extent possible. | |
| **Protective Equipment** | ✔ Provide workers with an acceptable face covering at no-cost to the employee and have an adequate supply of coverings in case of need for replacement. | ✔ Require customers to wear face coverings when not seated at a table (e.g. when waiting for pickup, placing order at counter/window, walking to/from table, walking to/from restroom). |
| | ✔ Acceptable face coverings include but are not limited to cloth (e.g. homemade sewn, quick cut, bandana), surgical masks, and face shields. | ✔ Encourage, but don't require, customers to wear face coverings when seated at a table and not eating and/or drinking. |
| | ✔ Ensure all staff wear face coverings at all times and that they practice hand hygiene and use bare hand barriers consistent with state and local sanitary codes. | ✔ In food trucks and concessions where there are not running water stations, employees should wear gloves or regularly use hand sanitizer and continue to comply with federal, state, and local food handling and hygiene requirements. |
| | • If employees wear gloves during non-food preparation activities, ensure they replace gloves frequently, and encourage them to change gloves when switching tasks (e.g. serving customers to pre-rolling silverware). | |
| | • If employees do not wear gloves, ensure they frequently wash their hands with soap/water. | |
| | ✔ Clean, replace, and prohibit sharing of face coverings. Consult the CDC guidance for additional information on cloth face coverings and other types of personal protective equipment (PPE), as well as instructions on use and cleaning. | |
| | ✔ Train employees on how to don, doff, clean (as applicable), and discard PPE. | |

WEAR A MASK.   GET TESTED.   SAVE LIVES.



NEW YORK STATE

# Reopening New York

**Food Services Guidelines for Employers and Employees**

These guidelines apply to all restaurants and food services establishments, including food trucks and other food concessions. In regions that are in Phase 1, or have not yet reached Phase 2, such establishments may only operate by take-out and delivery. In regions that have reached Phase 2, such establishments may open outdoor spaces with seating for customers, in accordance with "Interim COVID-19 Guidance for Outdoor and Take-Out/Delivery Food Services." In regions that have reached or surpassed Phase 3, such establishments may open indoor spaces with seating for customers, in accordance with the guidelines below/in "Interim COVID-19 Guidance for Food Services." Please see the aforementioned guidance for the definition of "outdoor space."

During the COVID-19 public health emergency, all operators of food service sites should stay up to date with any changes to state and federal requirements related to such establishments and incorporate those changes into their operations. This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.

|  | Mandatory | Recommended Best Practices |
|---|---|---|
| **Protective Equipment (Cont'd)** | ✔ Limit the sharing of objects (e.g. kitchen tools, pens, pads), as well as the touching of shared surfaces (e.g. doorknobs, keypads, touch screens); or, require workers to wear gloves when in contact with shared objects or frequently touched surfaces; or, require workers to perform hand hygiene before and after contact. <br><br> ✔ Ensure that employees who are bussing tables wash their hands with soap/water and, if they wear gloves, replace the gloves before and after cleaning and disinfecting tables. |  |
| **Hygiene, Cleaning, and Disinfection** | ✔ Adhere to hygiene, cleaning, and disinfection requirements from the Centers for Disease Control and Prevention (CDC) and Department of Health (DOH) and maintain logs that document date, time, and scope of cleaning. <br><br> ✔ Provide and maintain hand hygiene stations including handwashing with soap, running warm water, and disposable paper towels, as well as an alcohol-based hand sanitizer containing 60% or more alcohol for areas where handwashing is not available or practical. <br><br> ✔ Provide and encourage employees to use cleaning and disinfection supplies for shared surfaces for use before and after use of these surfaces, followed by hand hygiene. <br><br> ✔ Regularly clean and disinfect the establishment and more frequently clean and disinfect high risk areas used by many individuals and for frequently touched surfaces (e.g. restrooms). Cleaning and disinfection must be rigorous and ongoing and should occur at least after each shift, daily, or more frequently if needed. <br><br> ✔ Ensure that equipment is regularly cleaned and disinfected using registered disinfectants, including at least as often as employees change workstations. Refer Department of Environmental Conservation (DEC) products identified by the Environmental Protection Agency (EPA) as effective against COVID-19. | ✔ Discourage food preparation employees from changing/ entering each other's work stations during shifts, unless they are appropriately cleaned/disinfected. <br><br> ✔ Provide guests with a single-use, paper, disposable menus and/or display menus on white boards/chalk boards/televisions/projectors. <br><br> ✔ Encourage customers to view menus online (e.g. on their own smartphone or electronic device), where possible. <br><br> ✔ Make hand sanitizer available throughout high-tough areas (e.g. outside restrooms), and place it in convenient locations, such as at entrances, exits, and cashiers. Install touch-free hand sanitizer, where possible. |



# Reopening New York



**NEW YORK STATE**

**Food Services Guidelines for Employers and Employees**

These guidelines apply to all restaurants and food services establishments, including food trucks and other food concessions. In regions that are in Phase 1, or have not yet reached Phase 2, such establishments may only operate by take-out and delivery. In regions that have reached Phase 2, such establishments may open outdoor spaces with seating for customers, in accordance with "Interim COVID-19 Guidance for Outdoor and Take-Out/Delivery Food Services." In regions that have reached or surpassed Phase 3, such establishments may open indoor spaces with seating for customers, in accordance with the guidelines below/in "Interim COVID-19 Guidance for Food Services." Please see the aforementioned guidance for the definition of "outdoor space."

During the COVID-19 public health emergency, all operators of food service sites should stay up to date with any changes to state and federal requirements related to such establishments and incorporate those changes into their operations. This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.

| | Mandatory | Recommended Best Practices |
|---|---|---|
| **Hygiene, Cleaning, and Disinfection (Cont'd)** | ✔ Before returning to work, complete pre-return checks and assessments of kitchen systems to ensure a healthy and safe environment. | |
| | ✔ Minimize sharing of kitchen equipment between staff (e.g. knives, pots, rags/towels), where possible. | |
| | ✔ Do not provide customers with devices (e.g. buzzers) to provide alerts to customers that seating or an order is available, unless such devices are thoroughly cleaned and disinfected between each use. | |
| | ✔ Provide cleaning and disinfection of exposed areas in the event of an individual is confirmed to have COVID-19, with such cleaning and disinfection to include, at a minimum, all heavy transit areas and high-touch surfaces . | |
| | ✔ For take-out/delivery: <br><br>• Provide hand hygiene stations for customers waiting for food and/or drinks. <br><br>• Ensure staff wash hands with soap/water or use hand sanitizer; if staff use gloves, regularly replace them. <br><br>• If pick-up/delivery is indoors, ensure windows/doors are opened to allow for ventilation. | |
| | ✔ Ensure all condiments provided directly to customers are in single-use disposable containers or reusable containers that are regularly cleaned/disinfected. | |
| | ✔ If non-disposable menus are used, clean and disinfect the menus between each party's use. | |
| | ✔ Use pre-packaged silverware or pre-rolled silverware, Silverware must be pre-rolled while wearing masks and gloves. | |

**WEAR A MASK.     GET TESTED.     SAVE LIVES.**



# Reopening New York

## Food Services Guidelines for Employers and Employees

These guidelines apply to all restaurants and food services establishments, including food trucks and other food concessions. In regions that are in Phase 1, or have not yet reached Phase 2, such establishments may only operate by take-out and delivery. In regions that have reached Phase 2, such establishments may open outdoor spaces with seating for customers, in accordance with "Interim COVID-19 Guidance for Outdoor and Take-Out/Delivery Food Services." In regions that have reached or surpassed Phase 3, such establishments may open indoor spaces with seating for customers, in accordance with the guidelines below/in "Interim COVID-19 Guidance for Food Services." Please see the aforementioned guidance for the definition of "outdoor space."

During the COVID-19 public health emergency, all operators of food service sites should stay up to date with any changes to state and federal requirements related to such establishments and incorporate those changes into their operations. This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.

|  | Mandatory | Recommended Best Practices |
|---|---|---|
| **Communication** | ✓ Affirm you have reviewed and understand the state-issued industry guidelines, and that you will implement them. | ✓ Use audio announcements, text messages or notices on screens to communicate with customers awaiting an order/seating. |
|  | ✓ Post signage to remind employees and patrons to adhere to proper hygiene, social distancing rules, appropriate use of PPE, and cleaning and disinfection protocols. | ✓ Establish a communications plan for employees, vendors, and customers that includes a consistent means to provide updated information. |
|  | ✓ Immediately notify the state and local health department if a worker was in close contact with others and tests positive for COVID-19. |  |
|  | ✓ Cooperate with contact tracing efforts, including notification of potential contacts in the workplace, while maintaining confidentiality required by state and federal law and regulations. |  |
|  | ✓ Conspicuously post completed safety plans on site. |  |
| **Screening** | ✓ Implement mandatory daily health screening practices (e.g. questionnaire, temperature check) of their employees and, where practicable, vendors, but such screening shall not be mandated for customers and delivery personnel. | ✓ Prevent employees from intermingling in close or proximate contact with each other prior to completion of the screening (e.g. perform screening remotely). |
|  | ✓ At a minimum, screening must determine whether the employee or vendor has had: 1) COVID-19 symptoms in past 14 days, (2) positive COVID-19 test in past 14 days, and/or (3) close contact with confirmed or suspected COVID-19 case in past 14 days. | ✓ Screeners should be trained by employer-identified individuals familiar with CDC, DOH, and OSHA protocols and wear appropriate PPE.<br><br>✓ Maintain a log of every person, including workers and vendors, who may have close or proximate contact with other individuals at the work site or area, such that all contacts may be identified, traced and notified in the event an employee is diagnosed with COVID-19; excluding customers and deliveries performed with appropriate PPE or through contactless means. |
|  | ✓ Designate a point-of-contact as the party for individuals to inform if they later are experiencing COVID-19-related symptoms, as noted in the questionnaire. | ✓ Provide option for, but do not require, customers to provide contact information so they can be logged and contacted for contact tracing.<br><br>✓ Refer to DOH guidance regarding protocols and policies for employees seeking to return to work after a suspected or confirmed case of COVID-19 or after the employee had close or proximate contact with a person with COVID-19. |

WEAR A MASK.   GET TESTED.   SAVE LIVES.





# Reopening New York

NEW YORK STATE

## Food Services Guidelines for Employers and Employees

These guidelines apply to all restaurants and food services establishments, including food trucks and other food concessions. In regions that are in Phase 1, or have not yet reached Phase 2, such establishments may only operate by take-out and delivery. In regions that have reached Phase 2, such establishments may open outdoor spaces with seating for customers, in accordance with "Interim COVID-19 Guidance for Outdoor and Take-Out/Delivery Food Services." In regions that have reached or surpassed Phase 3, such establishments may open indoor spaces with seating for customers, in accordance with the guidelines below/in "Interim COVID-19 Guidance for Food Services." Please see the aforementioned guidance for the definition of "outdoor space."

During the COVID-19 public health emergency, all operators of food service sites should stay up to date with any changes to state and federal requirements related to such establishments and incorporate those changes into their operations. This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.

| | Mandatory | Recommended Best Practices |
|---|---|---|
| **In-Person and Catered Events**<br><br>See "Interim COVID-19 Guidance for Food Services" for full details on requirements for in-person and catered events. | ✓ Effective March 15, 2021, event venue and facility owners/operators and event organizers must comply with additional requirements for events that involve the preparation and service of food/beverage. Effective May 3, 2021, residential events may be held above the State's residential gathering limit as long as the event is staffed and serviced by a professional, licensed caterer, the event is permitted by the respective locality or municipality, and the event strictly adheres to applicable health protocols contained within this guidance and section.<br>• In-person and catered events are prohibited from being held between 12AM-5AM until further notice.<br>• Venue owners/operators and event organizers must maintain sufficient employee presence to ensure compliance with health and safety requirements.<br><br>✓ Limit occupancy to the lesser of: 75% as set by the certificate of occupancy, or 150 people indoors or 200 people outdoors, exclusive of employees/event staff. Effective April 2, 2021, limit the occupancy to the lesser of 75% as set by the certificate of occupancy, or 150 people indoors or 500 people outdoors.<br><br>✓ Notify county health department or local public health authority of plans to host in-person and catered events above the State's maximum social gathering limit.<br><br>✓ Require each attendee to sign in before, or immediately upon, arrival to the event.<br><br>✓ Require and ensure all attendees over age 2 have received a negative diagnostic test result for COVID-19 using a FDA or DOH authorized PCR or NAAT test that was performed on a specimen collected within 72 hours of the event start time. Negative test results for COVID-19 from an FDA authorized antigen test performed on a specimen collected within 6 hours of the event start time may also be accepted. All attendees must present proof of the negative diagnostic test result prior to/immediately upon arrival to the event. Alternatively, attendees may provide proof of having completed the COVID-19 vaccination series at least 14 days prior to the event. However, testing is still recommended. | ✓ Install appropriate physical barriers where attendees may frequently interact with employees/event staff (e.g., host station reception desk).<br><br>✓ Implement touchless systems for transactions (e.g., check in).<br><br>✓ Limit amenities/event services that present unnecessary interactions between employees/event staff and attendees (e.g., coat checks, valet, parking attendant), unless additional protective measures can be adopted (e.g., contactless transactions, frequent cleaning/disinfection of shared equipment or surfaces, use of disposable gloves).<br><br>✓ Stagger intervals for food service at staffed buffets to facilitate social distancing while attendees are waiting in line.<br><br>✓ Serve any passed foods (e.g., hors d'oeuvres) in containers that limit touching of any shared surfaces (e.g., platters) by attendees.<br><br>✓ To allow attendees to maintain appropriate social distance while dancing, event organizers may consider setting and enforcing capacity limits for dance floors, assigning tables of attendees to different times on the dance floor, alternating which tables of attendees can dance at a given time, dividing the dance floor into zones for tables of attendees, and/or other measures to reduce potential crowding and close contact among attendees. |

WEAR A MASK.     GET TESTED.     SAVE LIVES.



# Reopening New York



**NEW YORK STATE**

**Food Services Guidelines for Employers and Employees**

These guidelines apply to all restaurants and food services establishments, including food trucks and other food concessions. In regions that are in Phase 1, or have not yet reached Phase 2, such establishments may only operate by take-out and delivery. In regions that have reached Phase 2, such establishments may open outdoor spaces with seating for customers, in accordance with "Interim COVID-19 Guidance for Outdoor and Take-Out/Delivery Food Services." In regions that have reached or surpassed Phase 3, such establishments may open indoor spaces with seating for customers, in accordance with the guidelines below/in "Interim COVID-19 Guidance for Food Services." Please see the aforementioned guidance for the definition of "outdoor space."

During the COVID-19 public health emergency, all operators of food service sites should stay up to date with any changes to state and federal requirements related to such establishments and incorporate those changes into their operations. This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.

|  | Mandatory | Recommended Best Practices |
|---|---|---|
| **In-Person and Catered Events (Cont'd)** | ✔ Employees/event staff must be tested for COVID-19 through a diagnostic test prior to events, and must be tested biweekly thereafter for as long as they're hosting events and interacting in close contact with attendees. Alternatively, employees/event staff may provide proof of having completed the COVID-19 vaccination series at least 14 days prior to the date of event(s). | |
| | ✔ Any attendee who fails to present a negative diagnostic test result or proof of immunization, as described above, must be denied entry to the event. | |
| | ✔ Implement mandatory health screening for employees, event staff, and attendees prior to the event. | |
| | ✔ Ensure that all attendees maintain at least 6 ft. from other individuals, except for members of the same immediate party/household/family. | |
| | ✔ Assign each attendee to a table or area, where they must be seated while eating/drinking. | |
| | ✔ Ensure that individuals wear acceptable face coverings at all times; provided that attendees may remove their face coverings when seated at their assigned table to eat/drink. Certain attendees may also remove face coverings while presenting/speaking at the event if they maintain 12 ft. of distance, or are separated by an appropriate physical barrier, from other attendees. | |
| | ✔ Ensure attendees are not congregating, except when seated at their assigned table. Cocktail receptions where standing is permitted may take place with strict adherence to social distancing and provided that attendees only remove face coverings/consume food/beverages while seated. | |
| | ✔ Any live music/entertainment/dancing must follow the following parameters: <br>• Performers/entertainers must be separated from attendees by 12 ft. or appropriate physical barrier. <br>• Select attendees, designated prior to the event, may participate in ceremonial dances with members of their immediate party/household/family if they maintain 6 ft. from others. | |

**WEAR** A MASK.    **GET** TESTED.    **SAVE** LIVES.



# Reopening New York

**Food Services Guidelines for Employers and Employees**



NEW YORK STATE

These guidelines apply to all restaurants and food services establishments, including food trucks and other food concessions. In regions that are in Phase 1, or have not yet reached Phase 2, such establishments may only operate by take-out and delivery. In regions that have reached Phase 2, such establishments may open outdoor spaces with seating for customers, in accordance with "Interim COVID-19 Guidance for Outdoor and Take-Out/Delivery Food Services." In regions that have reached or surpassed Phase 3, such establishments may open indoor spaces with seating for customers, in accordance with the guidelines below/in "Interim COVID-19 Guidance for Food Services." Please see the aforementioned guidance for the definition of "outdoor space."

During the COVID-19 public health emergency, all operators of food service sites should stay up to date with any changes to state and federal requirements related to such establishments and incorporate those changes into their operations. This guidance is not intended to replace any existing applicable local, state, and federal laws, regulations, and standards.

| | Mandatory | Recommended Best Practices |
|---|---|---|
| **In-Person and Catered Events (Cont'd)** | • Attendees may dance in designated and clearly marked area(s) as long as attendees wear face coverings and maintain 6 ft. of social distance, except for members of their same party (e.g., dates), family, or household.<br><br>✓ Post appropriate signage notifying attendees of social distancing and face covering requirements. | |

WEAR A MASK.   GET TESTED.   SAVE LIVES.

# Exhibit C



No. 202.45

<u>E X E C U T I V E   O R D E R</u>

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby extend any directive contained in Executive Order 202.34 and 202.35, provided such directive has not been superseded by a subsequent directive, and further, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 26, 2020 the following:

- Paragraph (e) of subdivision 1 of Section 581 of the Labor Law, to the extent necessary to authorize the Commissioner of Labor to issue a finding related to experience rating charges as permitted by the Families First Coronavirus Response Act and incurred beginning with the benefit week starting March 9, 2020;

- Subdivision 4 of section 1 of chapter 25 of the laws of 2020 is modified to the extent necessary to provide that in addition to any travel to a country for which the Centers for Disease Control and Prevention has a level two or three travel health notice, an employee shall not be eligible for paid sick leave benefits or any other paid benefits pursuant to this chapter if such employee voluntarily travels which commences after June 25, 2020 to a state with a positive test rate higher than 10 per 100,000 residents, or higher than a 10% test positivity rate, over a seven day rolling average, and which the commissioner of the department of health has designated as meeting these conditions as outlined in the advisory issued pursuant to Executive Order 205, and the travel was not taken as part of the employee's employment or at the direction of the employee's employer;

- Section 28-66 of the Charter of the City of Buffalo, to the extent necessary to allow the Mayor to waive the additions prescribed therein on unpaid 2019-2020 city taxes for the months of April, May and June of 2020, and to require payments of 2019-2020 city taxes that are made after June 30, 2020 to be made without additions for the months of April, May and June of 2020;

IN ADDITION, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law to extend during a State disaster emergency the period for paying property taxes without interest or penalties upon request of the chief executive officer of an affected county, city, town, village or school district, I do hereby extend by twenty-one days the period for paying, without interest or penalty, property taxes that are due in the following localities that have requested such an extension: Village of Ossining, Westchester County; Village of Pomona, Rockland County;

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through July 26, 2020:

- The directive contained in Executive Order 202.35, as extended and as amended by Executive Order 202.38 and Executive Order 202.42, which amended the directive in Executive Order 202.10 that limited all non-essential gatherings, is hereby further modified to allow gatherings of fifty (50) or fewer individuals for any lawful purpose or reason, so long as any such gatherings occurring indoors do not exceed 50% of the maximum occupancy for a particular indoor area, and provided that the location of the gathering is in a region that has reached Phase 4 of the State's reopening, and provided further that social distancing, face covering, and cleaning and disinfection protocols required by the Department of Health are adhered to.

- Executive Order 202.41, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, 202.31, 202.34, and 202.35 which each closed or otherwise restricted public or private businesses or places of public accommodation, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:

  o That effective on June 26, 2020, the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase Four industries, as determined by the Department of Health, in eligible regions, including:
    - Higher Education;
    - Film and Music Production;
    - Low-risk indoor arts and entertainment;
    - Low-risk outdoor arts and entertainment; and
    - Professional Sports without fans.
  o Businesses or entities in industries open in Phase Four must be operated in compliance with the guidance promulgated by the Department of Health.
  o As of June 26, 2020 the regions meeting the prescribed public health and safety metrics required for Phase Four reopening are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier, and the North Country. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open Phase Four industries, subject to the same terms and conditions.
  o Any previous directive that restricted operation of any industry, business, or facility that is permitted to open in Phase One, Phase Two, Phase Three, or Phase Four is hereby superseded, only insofar as it is inconsistent with any Executive Order allowing businesses, industries, and facilities to reopen.

- The directive contained in Executive Order 202.44 regarding elective surgeries is hereby amended to provide that the directive contained in Executive Order 202.10 authorizing the Commissioner of Health to direct all general hospitals, ambulatory surgery centers, office-based surgery practices and diagnostic and treatment centers to increase the number of beds available to patients, including by cancelling all elective surgeries and procedures, is hereby modified to authorize general hospitals to perform elective surgeries and procedures so long as the established criteria are met currently, whether or not such criteria were met on the dates set forth in such directive, and as modified by the June 14th Department of Health guidance.

- Executive Order 202.34, which extended the directive contained in Executive Orders 202.28, 202.18, 202.14 and 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide, is hereby continued to provide that all schools shall remain closed to in-person instruction except for the purpose of provision of special education services. School districts must ensure the availability of meals, and child care, with an emphasis on serving children of essential workers. Meals may be provided by an alternative entity, provided that the school district shall be responsible for ensuring that all children have access to free meals. Should the students not have access through an alternative entity, the school district must provide the meals.

GIVEN under my hand and the Privy Seal of the

State in the City of Albany this twenty-

sixth day of June in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor